STATE of Missouri, Respondent,

v.

Arthur GARNER, Appellant.

No. 25042.

Missouri Court of Appeals,
Southern District,
Division One.

April 11, 2003.

Emmett D. Queener, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Patrick T. Morgan, Asst. Atty. Gen., for Respondent.

KERRY L. MONTGOMERY, Presiding Judge.

A jury convicted Arthur Garner (Defendant) of four counts of sexual misconduct involving a child by coercion in violation of

§ 566.083.[1] Defendant was also charged with one count of sexual misconduct in the first degree, § 566.090, for sexual contact of C.O. through her clothing, but the jury found him not guilty of that charge. Defendant was sentenced to five year's imprisonment for each count, to be served consecutively.

Here, Defendant's first point challenges the sufficiency of the evidence. His second point alleges the trial court erred in allowing his preliminary hearing testimony to be read to the jurors. We affirm.

"In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the State and disregard all evidence and inferences to the contrary." *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). " '[R]eview is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt.' " *Id.* (*quoting State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)).

Viewed in the light most favorable to the verdict, Tammy Krogel (Mother) lived with her three daughters in a trailer park with her husband, Gary Krogel. Tammy's daughters, T.O, J.O., and C.O, were ages eleven, nine, and seven years old, respectively. Defendant, Gary's stepfather, lived with his wife one trailer away from the Krogels. Gary's sister, Barbara Rodden, lived in a trailer in between the Krogels and Defendant. Because the Krogels both worked, Defendant would often babysit the three girls and S.P., a friend of T.O.'s. S.P., aged ten years old, lived one street away from T.O. and often visited T.O. while her parents and the Krogels were gone.

In September of 1999, while T.O., J.O., and C.O. were at Rodden's trailer, C.O. told Rodden that they ran in front of Defendant without their clothes. J.O. tried to silence C.O. by covering her mouth and told C.O. that they were not supposed to say that and that they were not supposed to tell. Rodden got few details from the girls and told Defendant's wife about the incident. She did not tell the Krogels.

A few weeks later, toward the end of September, C.O. had returned from spending almost the entire weekend at Defendant's house. Mother observed that C.O. was upset. C.O. told Mother that Defendant had touched her in the "wrong place." C.O.'s allegation led the Krogels to contact their doctor. When Defendant learned that Mother was taking C.O. to the doctor, he made threats against Mother. C.O.'s doctor contacted the Division of Family Services (DFS). DFS conducted an investigation and interviewed all four girls, T.O., J.O., C.O., and S.P. The interviews were videotaped and played for the jury at trial. In the interviews, the girls related several incidents where Defendant had forced them to expose themselves. One such incident occurred when they were playing a game of "Truth or Dare." Defendant, who was aware of their game, dared them to run from one end of the trailer to the other naked. The girls did not want to, but Defendant told them they "had to." He told them they could not quit playing the game until they did this. When T.O. refused, Defendant called her a "chicken." Eventually she complied. Later the same day, Defendant forced them, while lying on the floor, to slide the clothing covering their crotch areas to the side and expose their genitals while he watched. Defendant referred to this as a "beaver shot."

<hr>

1. Statutory references are to RSMo 2002, unless otherwise indicated.

The girls also told the interviewer of other "games" played with Defendant. One such game involved Defendant pretending to be a vampire or an alligator. While playing the "vampire" or "alligator" game, he would grab the girls, including S.P., while they were swimming or jumping on the trampoline and place his mouth on their various body parts, including leg, neck, or back. He told them that if they told anyone about the game, they would not be able to see each other again. He specifically told S.P. that if she told anyone about the game, she would no longer be able to see T.O. again.

■ Defendant's first point alleges there was insufficient evidence to find that he compelled the girls to do anything by force or threat as required by § 566.083. He contends that there was no evidence of force because "[t]here was no evidence of physical contact or compulsion on the day the game was played, nor any evidence of physical force or compulsion ever subjected against the girls by [him]."

The State charged Defendant with violation of § 566.083 which provides, in pertinent part:

> 1. A person commits the crime of sexual misconduct involving a child if the person:
>
> . . . .
>
> (3) Coerces a child less than fourteen years of age to expose the child's genitals for the purpose of arousing or gratifying the sexual desire of any person, including the child.

The statute does not define the term "coerce." However, coercion was defined in the jury instructions as "to compel by force or threat." No further terms were defined for the jurors.

Appellant relies on *State v. Niederstadt*, 66 S.W.3d 12 (Mo. banc 2002), to support his position that the State was required to present evidence of physical force. In *Niederstadt*, the defendant was convicted of forcible sodomy, § 566.060.1, RSMo Supp.1991, which included having "deviate sexual intercourse with another person without that person's consent by the use of forcible compulsion." *Id.* at 14. "Forcible compulsion" was defined by statute as "physical force that overcomes reasonable resistance." The *Niederstadt* Court further defined "physical force" as simply "[f]orce applied to the body." *Id.* at 15 (*quoting State v. Kilmartin*, 904 S.W.2d 370, 374 (Mo.App.1995)). Appellant's reliance on *Niederstadt* is misplaced because Defendant's conviction for the crime of sexual misconduct under § 566.083 did not require a showing of "forcible compulsion."

Appellant has cited no Missouri case considering a similar situation of force or threat as coercion against a child. Our own independent research has disclosed no such case. However, courts have long recognized that force can occur without physicality. For example, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 448, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), noted that coercion can be mental as well as physical. Missouri courts following the *Miranda* decision have held that the test for determining whether a defendant's confession was voluntary includes "whether physical or psychological coercion was of such a degree that defendant's will was overborne." *State v. Cook*, 67 S.W.3d 718, 722 (Mo.App.2002) (*quoting State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986)).

Other jurisdictions have recognized that coercion can occur without physical force, especially when the coercer is an authority figure over a child. In *People v. Knapp*, 244 Mich.App. 361, 369, 624 N.W.2d 227 (2001), the Court of Appeals of Michigan examined what constitutes "coercion." It held that " 'force or coercion is not limited to physical violence but is instead deter-

mined in light of all the circumstances.'" *Id.* at 370, 624 N.W.2d 227 (*quoting People v. Reid,* 233 Mich.App. 457, 592 N.W.2d 767, 773 (1999)). It further held that "coercion by a person in a position of authority does not require a showing of physical violence but can be shown through evidence of the exploitation of a victim's special vulnerability." *Id.*

Further guidance can be found from *Ohio v. Eskridge,* 38 Ohio St.3d 56, 526 N.E.2d 304, 306 (1988), where the Supreme Court of Ohio acknowledged that the special relationship between a parent and child precludes the need for explicit threats or displays of force when a parent engages in sexual conduct with a child. It observed that "[f]orce need not be overt and physically brutal, but can be subtle and psychological." *Id.*

The force or threat used to compel T.O., J.O., C.O., and S.P. to expose themselves was subtle and psychological but no less forceful than if Defendant had used physical violence. Because Defendant was the supervising adult, he was in a position of power. He babysat the girls often, including evenings and weekends, and was affectionately known to T.O., J.O., and C.O. as "Grandpa." Rodden testified that he was more like a father than grandfather to the girls. The Supreme Court of North Carolina noted in *State v. Etheridge,* 319 N.C. 34, 352 S.E.2d 673, 681–82 (1987) that "[t]he child's knowledge of his father's power may alone induce fear sufficient to overcome his will to resist, and the child may acquiesce rather than risk his father's wrath." In *Etheridge,* the defendant told his son to "[d]o it anyway" after his son initially refused to undress. *Id.* at 681. The *Etheridge* court concluded the "words carried a great deal more menace than is apparent on the surface." *Id.*

Here, Defendant told all four girls that they "had to" undress and run the length of the trailer. When his demand was rebuffed by the oldest, T.O., he resorted to name-calling and pressure by ridiculing T.O. as a "chicken." He told them that they could not quit the "Truth or Dare" game until they had done so. He further told them they could not do anything else until they had removed their clothing. At trial, S.P. recalled that she was "uncomfortable" with this demand. In her videotaped testimony, T.O. stated she was "scared" of exposing herself. The fact that S.P. and T.O. were "uncomfortable" and "scared," but nevertheless complied with Defendant's demands, indicates that the girls believed they had no choice.

Defendant's position of power was reinforced by the girls' affection for him. Defendant took them to the park, swimming, roller skating, and even bought T.O., J.O., and C.O. their own bicycles. Defendant claimed he and his wife had no life of their own because they spent all their time tending to the girls. Defendant, on one occasion, had refused to be a caretaker to T.O., J.O., and C.O. for a period of a "couple of weeks." Defendant testified at his preliminary hearing that after refusing to babysit the three, C.O. came around and said, "Grandpa, please—we'll be good if you come back and take care of us." Clearly, the girls knew that if they disobeyed Defendant, they risked not only his wrath but the loss of his affection as well. An element of coercion exists in this situation.

In light of all the circumstances, the evidence was sufficient that a jury could have found that Defendant compelled, by force or threat, T.O., J.O., C.O., and S.P. to expose their genitals for the purpose of arousing or gratifying his sexual desire. Point denied.

■ Defendant's second point on appeal alleges that the trial court erred in overruling his objection and allowing the prose-

cution to read his preliminary hearing testimony to the jury. He asserts that his testimony did not incriminate him and, therefore, did not fall within the hearsay rule exception for an admission against interest.

 "A trial court has broad discretion in deciding whether to admit or exclude evidence at trial." *State v. Sales,* 58 S.W.3d 554, 558 (Mo.App.2001). "We will not disturb the trial court's ruling unless we find that it clearly abused its discretion." *Id.* "Such abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic of the circumstances before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful deliberate consideration." *State v. Robinson,* 90 S.W.3d 547, 550 (Mo.App. 2002). " 'Furthermore, in matters involving the admission of evidence, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.' " *Id.* (*quoting State v. Harrison,* 24 S.W.3d 215, 218 (Mo.App.2000)).

Defendant testified at his preliminary hearing and his testimony was transcribed. At trial, the State requested permission to enter into evidence the transcript of Defendant's preliminary hearing testimony. In that hearing, Defendant acknowledged that C.O. had spent the night with him on September 25, the night the alleged sexual misconduct in the first degree occurred. He denied inappropriately touching C.O.

The State offered this testimony as Defendant's admission against interest as well as consciousness of guilt. The trial court overruled Defendant's objections and permitted the State to read the transcript to the jurors. The statements provided by Defendant at the preliminary hearing did not mention the "Truth of Dare" game and made only an oblique reference to the

counts involving sexual misconduct by coercion. The State used Defendant's testimony as an admission against interest because his statements tended to incriminate him on the count of sexual misconduct in the first degree.

 The admission of a criminal defendant is relevant and material if it tends to incriminate the defendant, to connect the defendant to a crime, or to manifest the defendant's consciousness of guilt. *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993). The defendant need not expressly acknowledge his or her guilt for the statement to qualify as an admission. *State v. Bannister,* 680 S.W.2d 141, 148 (Mo. banc 1984). To determine whether the statement constitutes an admission, the statement must be viewed in the light of the surrounding circumstances. *Id.*

In *State v. Bevineau,* 460 S.W.2d 683 (Mo.1970), the defendant was convicted of assault with intent to kill after he and his partner attempted to rob a store cashier. During the robbery attempt, defendant shot a police officer. On appeal, defendant contended his statement to a police officer after his arrest did not amount to a confession or an admission against interest. *Id.* at 687.

The police officer testified that defendant stated he had gone with his partner to rob a store, that he saw a policeman enter the store and struggle with his partner, and that he heard a shot and ran out the door. *Id.* at 686–87. The court summarily rejected defendant's contention by saying, "It certainly was [an admission against interest] because it placed [defendant] at the scene of the offense and an inference of guilt, in connection with the evidence offered, could be drawn from it against [defendant]." *Id.*

The same situation exists here as found in *Bevineau* because Defendant's prelimi-

nary hearing testimony placed him with C.O. on the night of the alleged sexual touching. Therefore, Defendant's testimony placed him at the scene of the offense, and an inference of guilt could be drawn from the fact that Defendant was with C.O. at that time. We find no abuse of discretion in admitting Defendant's preliminary hearing testimony. Point denied.

The judgment is affirmed.

GARRISON and BARNEY, JJ., concur.